## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SOWATEI LOMOTEY,      :
 PLAINTIFF,       :
            : CIVIL ACTION NO. 3:09cv2143(VLB)
            :
 v.          : FEBRUARY 28, 2012
            :
STATE OF CONNECTICUT,    :
DEPT. OF TRANSPORTATION   :
 DEFENDANT.      :

## MEMORANDUM OF DECISION GRANTING DEFENDANT'S [DKT. #96] MOTION FOR SUMMARY JUDGMENT

Before the Court is a motion for summary judgment filed by the Defendant, State of Connecticut, Department of Transportation ("DOT"). The Plaintiff, Sowatei Lomotey ("Lomotey"), brought this suit alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") including allegations of failure to promote and retaliation. In addition, Lomotey alleges that the DOT engaged in a discriminatory practice of provisional appointments or temporary service in a higher classification as a means of favoring white candidates for employment and promotion. For the reasons stated hereafter, Defendant's motion for summary judgment is granted.

### Background

In 2005, Lomotey filed a substantially similar lawsuit to the instant action in the District of Connecticut alleging violations of Title VII including allegations of failure to promote, retaliation, and hostile work environment. *See Lomotey v. Connecticut Dept. of Transp.*, Civ. No.3:05-cv-1711(PCD) ("*Lomotey I*"). In that

prior lawsuit, Lomotey alleged that he had applied for and been discriminatorily denied promotion over twenty times.  See *Lomotey I*, No.3:05-cv-1711(PCD), 2009 WL 82501, at *2 (D. Conn. Jan. 12, 2009).   In addition, he alleged that the DOT favored Caucasian employees by giving them temporary placements as a method to circumvent the hiring process.  *Id.* at 7.  The *Lomotey I* court granted summary judgment finding that Lomotey had "failed to proffer evidence showing that Defendant's legitimate non-discriminatory reason for promoting other candidates rather than him [wa]s pretextual."  *Id.* at 13.  Lomotey then appealed the *Lomotey I* court's decision granting summary judgment to the Second Circuit.  The Second Circuit affirmed the judgment of the *Lomotey I* court agreeing with the district court's conclusion that Lomotey failed to proffer sufficient evidence demonstrating unlawful discrimination.  *See Lomotey v. Connecticut Dept. of Transp.*, 355 Fed. App. 478 (2d Cir. 2009) ("*Lomotey II*").

In 2009, Lomotey filed the instant action in which he made another failure to promote claim against the DOT along with a claim by Rebecca Johnson against the Connecticut Department of Administrative Services, and a claim by Stella Agu against the Connecticut Department of Mental Health and Addiction Services. The Plaintiffs alleged that the Defendant agencies engaged in a discriminatory practice of failing to hire and promote black African Americans in violation of Title VII.  Lomotey based this new claim against the DOT on two additional instances of failure to promote that were not the subject of his prior lawsuit.

Defendants then moved to sever the action for misjoinder of parties arguing that the three plaintiffs' claims were factually dissimilar. *See* [Dkt. #66].

2

The Court granted Defendants' motion to sever concluding that "all three plaintiffs work or worked in different agencies with different management and supervisors responsible for hiring and promotion and each performed different jobs.  The only common connection is that all three employers are agencies of the State of Connecticut."  *See* [Dkt. # 68].  Consequently, Lomotey filed an amended complaint against the DOT consisting solely of the allegations related to his employment with the DOT.   In his amended complaint, Lomotey purports to bring suit on behalf of himself and on behalf of all similarly situated other black African Americans.

Defendant DOT is seeking summary judgment on the basis that Plaintiff's claims are barred by the principles of res judicata and collateral estoppel as a result of his prior lawsuit.  In addition, Defendant also seeks summary judgment on the basis that Plaintiff has failed to proffer evidence establishing a prima facie claim of discrimination or retaliation in violation of Title VII or in the alternative has failed to demonstrate the pretextual nature of Defendant's proffered non-discriminatory reason for promoting other candidates.

Defendant has also argued in their summary judgment briefing that Plaintiff has failed to demonstrate a hostile work environment based on excessive scrutiny.  However, the operative complaint does not include any allegation that Plaintiff was subjected to a racially hostile work environment and the Plaintiff in his opposition to summary judgment has failed to respond to any of Defendant's arguments regarding hostile work environment.  Consequently, the Court finds that Plaintiffs have not brought a claim for hostile work environment in the first

instance and therefore the Court need not address Defendant's arguments in kind.

Lastly, Defendant has embedded in its motion for summary judgment a separate motion to strike the class action allegations from the operative complaint. The Court in an Order filed concurrently with this Opinion granted Defendant's request to strike the class action allegations and directed that the action proceed with respect to the claims Lomotey brings on behalf of himself.

Facts

The following facts relevant to Defendant's motion for summary judgment are undisputed unless otherwise noted. As noted above, Lomotey filed a substantially similar lawsuit to the instant action alleging violations of Title VII including allegations of failure to promote, retaliation, and hostile work environment. *See Lomotey I*, Civ. No.3:05-cv-1711(PCD). In the instant action, Lomotey essentially advances the same theory of discrimination as he did in *Lomotey I* and much of the same factual allegations and evidence that were at issue in *Lomotey I* are also at issue in the instant action. The *Lomotey I* court granted summary judgment and its decision was affirmed by the Second Circuit. See *Lomotey I*, No.3:05-cv-1711(PCD), 2009 WL 82501 (D. Conn. Jan. 12, 2009) affirmed by *Lomotey II*, 355 Fed. App. 478 (2d Cir. 2009). The Court will presume the parties' familiarity with the *Lomotey I* and *II* courts' analysis and conclusions.

Lomotey's current claim against the DOT is based on two additional instances of failure to promote that were not the subject of his prior lawsuit.

Lomotey applied for and was denied a promotion to the position of Transportation Principal Engineer ("TPE") in the Bridge Design Unit that was posted on December 21, 2006 and the position of Transportation Supervising Engineer ("TSE") in Consulting Bridge Design Group that was posted on April 2, 2007.  *See* [Dkt. #98, Def. Mem. at 11].  These new instances of failure to promote were the subject of a subsequent and separate Connecticut Commission on Human Rights and Opportunities ("CHRO") complaint.  Therefore Lomotey's claims in the instant lawsuit are predicated on two subsequent failures to promote that were not at issue in *Lomotey I*.  However, Lomotey relies on evidence of his earlier promotion denials which were the subject of his lawsuit in *Lomotey I* as background evidence in support of his new claim regarding the 2006 and 2007 failures to promote.

Consequently, both parties in their Local Rule 56 Statements have relied heavily on the submissions and pleadings that were offered in the *Lomotey I* action.  For example, the Defendant has attached copies of its prior Local Rule 56 Statement, Plaintiff's prior complaint, and underlying memoranda of both parties to its current Local Rule 56 Statement. *See* [Dkt. # 96, Def. Local Rule 56 Statement at ¶¶1-49].

i.    *Summary of undisputed facts asserted in Lomotey I*

Rather than revisit anew the factual assertions made in the prior lawsuit which have been both referenced and resubmitted in the current action, the Court

refers to the following summary of facts that the *Lomotey I* court found to be undisputed:

"Plaintiff is a black person from the African country of Ghana. (Compl.¶ 3) He earned a bachelor of science degree in civil engineering from the State University of New York ("SUNY") at Buffalo in 1974, and a masters degree in structural engineering from SUNY Buffalo in 1978. Plaintiff also has Professional Engineer licenses from the states of Massachusetts and Connecticut in Civil and Structural Engineering. Following graduation, he worked for various engineering firms and the Massachusetts Department of Transportation. He was then employed at two engineering consulting firms, Greiner & Close and Jensen & Miller, P.C., for a combined ten (10) years immediately prior to being hired by Defendant Connecticut Department of Transportation ("DOT") in 1994. Plaintiff was hired in early 1994 as an Engineer Intern in the Major Bridge Group of the Structures Section of the Consultant Design Division in the Bureau of Engineering and Highway Operations. Within nine (9) months of being hired as an Engineer Intern, and after scoring highly on the applicable exam within the Decentralized Promotional Examination Program, Plaintiff was promoted to Transportation Engineer 3 ("TE3"), bypassing the job levels of Transportation Engineer 1 & 2." *Lomotey I*, 2009 WL 82501, at *1.

"The typical career progression within DOT is Engineer Intern ("EI"), Transportation Engineer 1 ("TE1"), Transportation Engineer 2 ("TE2"), Transportation Engineer 3 ("TE3"), Transportation Supervising Engineer ("TSE"), and Transportation Principal Engineer ("TPE"). Defendants represent that the

next steps are Transportation Assistant District Engineer ("TADE") and Transportation District Manager ("TDE"), which usually progress from the TPE position, although the job descriptions allow for eligibility based on TSE experience." *Id.*

"Plaintiff's employment evaluations reveal that his performance was rated as "excellent" from his hiring in 1994 through 1997. (Pl.'s Ex. 14) From 1998 through 2005, however, Plaintiff's performance was rated as only "satisfactory" on the majority of measures. *Id.* In 2006 and 2007, the most recent review provided, Plaintiff once again received predominantly "excellent" ratings. Since 2001, Plaintiff has applied for and been denied promotion over twenty times … Plaintiff met the minimum qualifications to apply for these positions and in many cases was interviewed for the jobs. All the individuals selected for the positions for which Plaintiff applied were white, with the exception of one, who was Asian. (See Pl.'s Ex. 4.) Thus, in 14 years with the DOT, Plaintiff has not been promoted beyond the TE3 level at which he was placed soon after being hired in 1994." *Id.* at 2.

"On September 26 and 27, 2000, Plaintiff testified at a public hearing before the Connecticut Commission on Human Rights and Opportunities ("CHRO") in support of DOT employee Jayantha Mather's employment discrimination complaint against the DOT. Thereafter, Plaintiff himself filed complaints of discrimination on the basis of race, color, and national origin against the DOT with the CHRO on June 11, 2001, September 4, 2002, May 3, 2004, and March 17,

2005.  (Def.'s Ex. S) Plaintiff filed the complaint in [*Lomotey I*] on November 7, 2005."  *Id.* at 2.

### ii.    Summary of new factual allegations asserted for the first time in the instant action

The following factual allegations have been asserted in the instant matter in support of Lomotey's new claims regarding the 2006 and 2007 failures to promote.[1]  Lomotey alleges in an affidavit supporting his opposition to summary judgment that he was inappropriately hired as an Engineer Intern in 1994 when the private industry experience he had at Greiner was the functional equivalent of a TE3 position and therefore he suggests that he should have been hired into the TE3 level.  *See* [Dkt. # 108. Pl. Mem. at 8 and Dkt. #109, Ex. A, Lomotey Affidavit at ¶44].

Lomotey alleges in his memorandum in opposition to summary judgment that the typical career progression of TE3 to TSE to TPE has been disregarded when it comes to Caucasian males.  *See* [Dkt. #108, Pl. Mem. at 8].   He alleges that Bart Sweeney did not spend six months at the TSE position and was quickly promoted and that Lewis Cannon in less than two years was promoted from TE3 to the top level as Transportation Construction Administrator ("TCA").  He further alleges that both Sweeney and Cannon were promoted without passing a single

---

[1] **The Court notes that Lomotey has failed to submit any "Disputed Issues of Material Fact" as required by Local Rule 56(a)(2) and therefore the Court has looked to Plaintiff's memoranda in opposition to summary judgment for an indication of which facts Plaintiff is asserting demonstrate an inference of discrimination or rebut the Defendant's non-discriminatory reason for promoting other individuals.**

Department of Administrative Services ("DAS") examination.  [*Id.*].  In his memorandum, Lomotey relies on a general citation to the entire 32 page excerpt of his deposition that has been submitted as an exhibit to his opposition to summary judgment as support for this assertion. *See* [Dkt. #109, Ex. D, Lomotey Dep.].  Lomotey has failed to indicate the page(s) which contain the relevant testimony which support these factual allegations.  After reviewing the entire excerpt, the Court was unable to locate within the deposition transcript where Lomotey testified that Cannon and Sweeney were promoted faster than the typical career progression.

Lomotey also alleges in his memorandum in opposition to summary judgment that every single Caucasion engineer of the TE3 and TE2 rank, who worked with Lomotey when he started as an Engineer Intern in the Major Bridge Group of the Structures Section of the Consultant Design Division in 1994 have been regularly promoted whereas Lomotey has not.  *See* [Dkt. #108, Pl. Mem. at 12].  Lomotey alleges that Julie Goerges was promoted from the TE3 to TSE and then to the TPE position.  He also alleges that John Hannifin, who was trained by Lomotey, was promoted from TE2 to TE3 to TSE positions and that Robert Reilly was promoted from TE2 to TE3.  [*Id.* at 13].  However, the deposition testimony that Lomotey relies on to support these assertions consist of Lomotey's statements that he trained Hannifin and that Hannifin was promoted to TE2 to TE3 within three years.  *See* [Dkt. #109, Ex. D, Lomotey Dep. at p. 116, line 116, p. 117. lines 16-17, 22-25, p. 82, lines 1-3].

Lomotey alleges in his memorandum in opposition to summary judgment that he, in his own opinion, does interview well contrary to Defendant DOT's assessment of him and points to the fact that he was recruited in 1994 by the DOT for his expertise for a difficult engineering project. *See* [Dkt. #108, Pl. Mem. at 14]. He alleges that his interview skills have not diminished since 1994 and that he has routinely presented himself well in a setting where he is required to express himself verbally.  Lomotey asserts that he served as the DOT's primary witness in a litigation matter that involved an hour long deposition.  *See* [Dkt. #109, Ex. A, Lomotey Affidavit at ¶¶6, 116, 119, 118].  He also asserts that he testified in defense of the DOT as a project engineer and that he has defended all 34 bridge inspection reports in a question and answer format before DOT managers.  [*Id.* at ¶118].

Lomotey alleges in his memorandum in opposition to summary judgment that other minority employees at the DOT experienced a "levelizing" of their careers.  *See* [Dkt. #108, Pl. Mem. at 16].   Lomotey alleges that his African American supervisor Ralph Phillips has also applied for multiple positions but has not been promoted above the TSE level. [*Id.* at 16].  In support of this assertion, Lomotey submits a 10/13/2011 transcript from his fact-finding conference before the CHRO in which Ralph Phillips served as Lomotey's witness and also spoke about his own experience as a DOT employee.  *See* [Dkt. #110, Ex. C].  There is no indication that Mr. Phillips was under oath when he was interviewed by the CHRO.  These statements are therefore inadmissible hearsay.

Lomotey also alleges that Wanda Seldon, an African American female was performing her duties as Principal HR Specialist over Labor Relations and simultaneously acting as Human Resources Administrator for at least a year and half when she was denied a promotion and instead a white female, Vicki Aprin, was hired from outside the agency.  *See* [Dkt. #108, Pl. Mem. at 16].   Lomotey solely relies on Ms. Selden's deposition testimony in support of these assertions. *See* [Dkt. #111, Ex. E, Selden Dep. at p. 11-13].  Ms. Seldon testified that she believed she was qualified for the position.  When asked whether she believed that Ms. Aprin was more qualified than her for the position, Ms. Seldon testified that she could not "speak to that.  I was not on the interview panel." [*Id.* at 14].

Lomotey alleges in his unverified complaint that the DOT's Affirmative Action Director Cordula "alleged in her own federal lawsuit that '[o]ne way the DOT protects and rewards whites males who hold management positions is by placing them in temporary positions and then making the appointment permanent."  See [Dkt. #73, Pl. Compl. at ¶18].  However, Lomotey has failed to introduce any evidence of Cordula's testimony in opposition to summary judgment in the instant action.  Defendant notes that Lomotey had presented the testimony of Cordula in *Lomotey I* and that Defendants in their pleadings in *Lomotey I* had presented evidence that Cordula's testimony was limited to the higher level positions of Transportation Assistant District Engineer and Transportation District Engineer for which Cordula "testified that plaintiff was not qualified."  See [Dkt. #96, Def. Local Rule 56 Statement at ¶15].

Further, Defendant has submitted an affidavit from Cordula in the instant matter in which Cordula states that when she was an Equal Employment Manager for the DOT she would oversee the interview process and was responsible for reviewing selection decisions which required her final approval. *See* [Dkt. #96, Ex. P, Cordula Affidavit at ¶3].   She stated that in her role she would review the "entire interview package and consideration of the justification for the selection of the successful candidate, whether goal candidates or not" and that she would "either approve or disapprove of the Interview Selection Report."  See [Dkt. #96, Ex. P, Cordula Affidavit at ¶7].  She also states in her affidavit that she approved the Interview Selection Reports for the 2006 and 2007 positions that are the subject of the instant action and that her approval "indicated that I agreed with the panel's recommendation and had no concerns with the overall process."  [*Id.* at ¶10].

### a.  The 2006 TPE Position

Lomotey applied for a promotion to the position of TPE in the Bridge Design Group which was posted by the DOT on December 21, 2006.  Lomotey was denied the promotion on February 6, 2007.  The position was awarded to a white male Joseph Cancelliere.  There were seven candidates including Lomotey for the TPE position all of whom met the minimum qualification for the position. *See* [Dkt. #96. Def. Local Rule 56 Statement at ¶74].

Defendant indicates that both Lomotey and Cancelliere submitted copies of their last two performance appraisals in connection with their employment applications and that there was a minimal distinction among the columns in the

"good" ratings between Lomotey and Cancelliere's appraisals and that overall there was minimal difference among their ratings.  [*Id.* at ¶77].  Defendant notes that Cancelliere's performance appraisal provided more detailed comments on his work performance than Lomotey's. [*Id.*].  Defendant indicates that Lomotey had met the one year of supervisory experience required for the TSE level based on the experience he gained outside of the DOT.  [*Id.* at ¶78].  Plaintiff disputes this and argues that he also met the supervisory experience through his work with the DOT's Load Evaluation Group.

Based on the DOT's records of the interviews, Defendant asserts that Cancelliere provided the most comprehensive answers to the substantive questions posed in the interview and had the most years of experience while Lomotey failed to provide sufficient answers to more questions than any other candidate. [*Id.* at ¶82]. Cancelliere had supervisory experience in his position of TSE in the Consultant Design Division which involved the management and oversight of the State Local Bridge Program and Federal Local Bridge Program for 13 years in which he supervised consultant liaison engineers and staff engineers.  [*Id.* at ¶86].  Defendant asserts that during his interview Cancelliere spoke about his specific DOT projects in which he managed "250 projects with different staff and budgets as well as schedules of varying importance."  [*Id.* at ¶85].

Defendant asserts that during the interview Cancelliere's responses indicate that Cancelliere thoroughly described the Context Sensitive Design/Solutions approach ("CSS approach") while Lomotey demonstrated no

13

understanding of the CSS approach and instead confused the concept with a "software product for calculating load ratings of bridges known as LRFD."  [*Id.* at ¶87].  Lomotey had previously received training on the CSS approach prior to the interview.  [*Id.* at ¶88].

Defendant asserts that in response to question 3 which related to current bridge issues Cancelliere demonstrated thorough knowledge of bridge issues at the DOT whereas "Lomotey did not answer the question but described the administration of a project." [*Id.* at ¶90].  Defendant indicates that neither Cancelliere or Lomotey provided thorough answers in response to question 4 which related to interpersonal and oral communication skills and knowledge of agency practices but that Cancelliere had during the interview "described the public involvement process in his responses to questions 1 and 2" which lead the Defendant to view his response to question 4 as average.  Defendant indicates that Lomotey's response to question 4 began with an irrelevant subject and that "[w]hile he made to two basic points, he needed to demonstrate in more detail his understanding of DOT's policy or practice in dealing with the public and preferably presenting experience of having done so." [*Id.* at ¶91].

Defendant asserts that the TPE position in the Bridge Design Unit is a first level management position or "supervisor's supervisor" and the "job requirements and duties are far broader than performing a detailed or complex engineering calculation but require familiarity with bridge issues in order to supervise staff performing detailed design analysis." [*Id.* at ¶93].  Lomotey attempts to dispute this assertion and in his affidavit he states that he has never

been supervised by a highway engineer like Cancelliere and that the position requires experience in the specific technical field which Cancelliere does not have.  *See* [Dkt. #109, Ex. A, Lomotey Affidavit at ¶36].

Lastly, Defendant asserts that Cancelliere had familiarity with bridge issues having spent 17 years overseeing DOT's Bridge programs, and four of those years he worked as a TE3 project Engineer and for 13 years as a TSE or Project Manager.  See [Dkt. #96. Def. Local Rule 56 Statement at ¶94].  Cancelliere also had experience with bridge design, highway design and other specialty aspects such as geotechnical engineering and hydrology as well as experience in contract preparation, administration, and public involvement.  [*Id.*].  Defendant admits that Lomotey also had familiarity with bridge issues having spent 6 years managing consultants in his TE3 and Engineer Intern positions.   Defendant asserts that Cancelliere had performed as a TSE for 13 years and therefore had much more experience in project and program level administration that Lomotey did not have from his experience in his TE3 position. [*Id.* at ¶95].

Lomotey alleges in his memorandum in opposition to summary judgment that he was more qualified than Cancelliere for the position. *See* [Dkt. #108, Pl. Mem. at 17].  Lomotey relies on his own deposition testimony and his affidavit in support of this assertion.  Lomotey asserts that Cancelliere had no PE license in structural engineering as he did.  He asserts that he is the only DOT staff engineer who holds a PE license in structural engineering. *See* [Dkt. #109, Ex. A, Lomotey Affidavit at ¶35].  Defendant explains that Lomotey's PE license in structural engineering is from Massachusetts and points out that Connecticut

does not have offer such specialized PE licenses and thus in Connecticut there is no such thing as a PE license in structural engineering.  *See* [Dkt. #116, Def. Reply Mem. at 12-13].  Cancelliere possesses a current Connecticut PE license and has no masters degrees.  [Dkt. #96, Def Local Rule 56 Statement at ¶80].

Lomotey asserts that "[a]lthough Cancelliere worked in the bridge design unit, he did not have the qualification to head the design group, not having knowledge of design analysis. *See* [Dkt. #108, Pl. Mem. at 17].  Lomotey asserts that the DOT ignored their own requirement that the candidate have work experience in the specific technical field when they hired Cancelliere.  Lomotey argues that "Cancelliere's expertise is as a highway engineer…[and] Cancelliere's experience in managing bridge programs or Consultants designing bridges is nothing more than 'paper-pushing' which is processing finished design projects." [*Id.* at 18].

During his interview for the 2006 TPE position, Lomotey alleges that he never discussed his Greiner supervisory experience during his interview.  He alleges that he only spoke about his DOT supervisory experience of being responsible for 6 engineering employees when he headed the Load Evaluation Group.  *See* [Dkt. #109, Ex. A, Lomotey Affidavit at ¶84].

Lomotey also asserts that during his interviews for the 2006 TPE position that he has no recollection that any of the panelists who were interviewing him were taking notes.  *See* [Dkt. #109, Ex. A, Lomotey Affidavit at ¶85].

a. *The 2007 TSE Position*

Lomotey applied for a promotion to the position of TSE in the consulting bridge design group that was posted on April 2, 2007.  Lomotey was denied the promotion on June 27, 2007.  The position was awarded to a white male, Bart Sweeney.  The TSE position was a temporary position which then led to Mr. Sweeney being placed into a permanent position.  See [Dkt. #108, Pl. Mem. at 19].

Lomotey alleges in his memorandum of opposition to summary judgment that Sweeney did not have to take an exam for this position.  See [Dkt. #108, Pl. Mem. at 19].  Lomotey also alleges that Sweeney was promoted again in less than six months to a management position in Construction Maintenance and was never required to take the exam.  [*Id.*].

Defendant asserts that the DOT made a request to DAS for the administration of an exam prior to the posting of the position on April 2, 2007 but that DAS suspended the exam as a result of negotiations with the Connecticut State Employee Association over revising the engineering job specifications. *See* [Dkt. #96. Def. Local Rule 56 Statement at ¶102].  Defendant asserts that given the immediate business need for the position, the position was posted as a temporary position and interviews conducted to allow for the later administration of an exam by DAS and the passage of the reinstated exam by the successful candidate.  [*Id.* at ¶103].   After the negotiations with the Connecticut State Employee Association concluded, DAS issued new job specifications in November 2008 and there was no longer an exam requirement for the TSE positions.  [*Id.* at ¶124].   The TSE position was revised to require only a PE license.  [*Id.*].

Sweeney and Lomotey along with 13 other candidates applied for the temporary TSE position.  Defendant indicates that both Lomotey and Sweeney submitted copies of their last two performance appraisals.  Sweeney had received "excellent" ratings in every category on each of his last two appraisals.  [*Id.* at ¶103].  In Lomotey's most recent appraisal, he received five "excellent" ratings and two "good" ratings.  In Lomotey's prior appraisal he received two "excellent" ratings and five "satisfactory" ratings, two of which were designated as "very good."  [*Id.*].  Like Lomotey, Sweeney has a masters degree in structural engineering.  Sweeney has a PE license while Lomotely has a license in both civil and structural engineering.  [*Id.* at ¶105].

Based on the DOT's records of the interviews, Defendant asserts that Sweeney provided the most comprehensive answers of all fifteen candidates and also explained his personal experience.  [*Id.* at ¶107].   Defendants further indicate that Lomotey's interview performance was similar to that of the other non-selected candidates in not providing as comprehensive and accurate answers.  [*Id.* at ¶108].   Defendant notes that Lomotey had also described an incorrect process with respect to the HBRR program which Sweeney had described correctly.  [*Id.* at ¶110].

Lomotey asserts without explication or substantiation that the DOT should not have made the position a temporary position as there was no immediate business need to warrant a temporary position and that DOT decided to create the temporary position as "cover for a retaliatory refusal to promote Plaintiff." *See* [Dkt. #108, Pl. Mem. at 20].

Lomotey asserts that he has good experience in a supervisory position. Lomotey points to his experience at the DOT in the Load Evaluation Group where he supervised six employees.  [*Id.* at 21].  Lomotey argues that since no one supervised him in that position he was "effectively supervisor of the load evaluation group for over a year while the TSE position remained vacant."  [*Id.*].

During his interview for the 2007 TSE position, Lomotey once again alleges that he never discussed his Greiner supervisory experience during his interview. He alleges that he only spoke about his DOT supervisory experience of being responsible for 6 engineering employees when he headed the Load Evaluation Group.  *See* [Dkt. #109, Ex. A, Lomotey Affidavit at ¶84].

Defendant indicate that "although Lomotey had DOT experience in managing consultants doing the design work for large bridge projects involving both repair and replacements" from 1994-2000, this experience did not include lead responsibility for projects.  [Dkt. #96. Def. Local Rule 56 Statement at ¶116]. Defendant indicates that Lomotey lacked lead responsibility for large projects. [*Id.* at ¶117].   Defendant also asserts that Lomotey only had the lead assignment for two smaller bridge projects in Stamford and Milford.  [*Id.* at ¶118].

Defendants assert that Sweeney had over 10 years of experience in his TE2 and TE3 positions in the Bridge Rehabilitation and Local Bridge Assistance Group.  Defendant indicates that "although these bridges were considered smaller projects, there were literally hundreds of projects for which Sweeney had

lead responsibility." [*Id.* at ¶122].   Overall, Sweeney had lead responsibility in his TE3 position for eight years and seven months

Lomotey again asserts that during his interview for the 2007 TSE position that he has no recollection that any of the panelists who were interviewing him were taking notes.  *See* [Dkt. #109, Ex. A, Lomotey Affidavit at ¶85].

Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.*, (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315-16 (2d Cir. 2006) (internal quotation marks and citation omitted).

 "A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary

judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch-Rubin v. Sandals Corp.*, No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted).

### Analysis of Res Judicata

Defendant argues that Plaintiff's claims are barred by the principles of res judicata and collateral estoppel on the basis of his prior lawsuit. "Res judicata operates as a bar to subsequent actions involving the same transaction, where the same evidence is relied upon, and where the facts essential to the second action were present in the first. In addition, in order for res judicata to apply, there must exist between the two actions an identity of parties, and the prior judgment must have been rendered on the merits." *Hasenstab v. City of New York*, 100 F.3d 942 (2d Cir. 1996) (citing *NLRB v. United Technologies Corp.*, 706 F.2d 1254, 1260 2d Cir. 1983)).

The Second Circuit has further instructed that:

It must first be determined that the second suit involves the same 'claim'-or 'nucleus of operative fact'-as the first suit.  Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, [and] whether the same evidence is needed to support both claims.  To ascertain whether two actions spring from the same 'transaction' or 'claim,' we look to whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage…With respect to the determination of whether a second suit is barred by res judicata, the fact that both suits involved essentially the same course of wrongful conduct is not decisive; nor is it

dispositive that the two proceedings involved the same parties, similar or overlapping facts, and similar legal issues. A first judgment will generally have preclusive effect only where the transaction or connected series of transactions at issue in both suits is the same, that is where the same evidence is needed to support both claims, and where the facts essential to the second were present in the first.  If the second litigation involved different transactions, and especially subsequent transactions, there generally is no claim preclusion.

*Interoceasnica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 90-1 (2d Cir. 1997) (internal

quotation marks and citations omitted).

Here, since Plaintiff's claim is predicated on the two subsequent failures to promote that occurred after he filed his complaint in *Lomotey I*, Plaintiff's prior action does not involve the same transactions that are at issue in the present case.  Many of the facts essential to determining whether the DOT violated Title VII when it failed to promote Lomotey in 2006 and 2007 were not present when Lomotey filed his prior lawsuit in 2005 as they took place subsequent in time. See *Brown v. Coach Stores, Inc.*, No.99Civ.10797(JSR), 2000 WL 1239113, at *1 n.2 (S.D.N.Y. 2000) (noting that "[p]rinciples of res judicata bar any failure-to-promote claim that relates to activities that antedate the filing of plaintiff's first lawsuit"). Consequently, res judicata does not bar Lomotey's present suit predicated on the subsequent incidents of the allegedly discriminatory failures to promote.

Further Lomotey may use evidence of his prior denials, which were the subject of his prior suit, as background evidence in his attempt to demonstrate that Defendant violated Title VII in connection with the 2006 and 2007 failures to promote although the Court questions the wisdom of doing so considering the *Lomotey I and II* courts' conclusion that such evidence was soundly insufficient

to demonstrate pretext.  *See Petrosino v. Bell Atlantic*, 385 F.3d 210, 220 (2d Cir. 2004) ("Nevertheless, evidence of earlier promotion denials may constitute relevant 'background evidence in support of a timely claim," and we will consider it as such.'") (citation omitted).

<u>Analysis of pattern-or-practice disparate treatment claim</u>

Lomotey alleges that the DOT engaged in a pattern-or-practice of discriminatory conduct.  Specifically that the 2006 and 2007 failures to promote were the result of the DOT's discriminatory practice of provisional appointments or temporary service in a higher classification as a means of favoring white candidates for employment and promotion.  This theory of discrimination is substantially identical to the theory Lomotey advanced in *Lomotey I and II*.

"To succeed on a pattern-or-practice claim, plaintiffs must prove more than sporadic acts of discrimination; rather, they must establish that intentional discrimination was the defendant's 'standard operating procedure.'"  *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)).  The Second Circuit has instructed that:

> At the liability stage, the plaintiffs must produce sufficient evidence to establish a prima facie case of a policy, pattern, or practice of intentional discrimination against the protected group. Plaintiffs have typically depended upon two kinds of circumstantial evidence to establish the existence of a policy, pattern, or practice of intentional discrimination: (1) statistical evidence aimed at establishing the defendant's past treatment of the protected group, and (2) testimony from protected class members detailing specific instances of discrimination.

*Id.* (internal quotation marks and citations omitted).   The Second Circuit has noted that "the heavy reliance on statistical evidence in a pattern-or-practice disparate treatment claim distinguishes such a claim from an individual disparate treatment claim proceeding under the *McDonnell Douglas* framework." *Id.*

Here, Lomotey has failed to introduce either statistical evidence or significant testimony from protected class members detailing specific instances of discrimination.   Lomotey relies primarily on his own anecdotal and speculative evidence of allegedly discriminatory incidents.    Courts in this circuit have observed that "[t]jhe case law is weighty in favor of defendants in pattern or practice cases where plaintiffs present only anecdotal evidence and no statistical evidence." *E.E.O. C. v. Bloomberg L.P.,* 778 F.Supp.2d 458, 470 (S.D.N.Y. 2011) (noting that "the EEOC's own compliance manual states that statistical evidence is 'extremely important' in a pattern or practice case.").   Where no statistical evidence has been presented, "the nature of such an allegation and the case law suggest that failure to present any statistical evidence means that the [plaintiff's] anecdotal and other evidence must be correspondingly stronger ... to meet [its] burden." *Id.* (internal quotations marks and citation omitted).   Here, a reasonable jury cannot conclude that a pattern or practice of discrimination occurred based on Lomotey's anecdotal evidence comprised mainly of his own affidavit and deposition testimony.

The *Lomotey I* court likewise concluded that absence of statistical and expert evidence was fatal to Lomotey's disparate impact claims.   *Lomotey I*, 2009 WL 82501, at *5 (finding that Lomotey's "disparate impact claim fails for lack of

the requisite statistical evidence and expert testimony to support it.").  The Second Circuit agreed that Lomotey's evidence that the DOT "favored Caucasian employees by giving them temporary placements ... amount[ed] to nothing more than raw numbers which, without further information on key considerations such as the racial composition of the qualified labor pool, cannot support an inference of discrimination."  *Lomotey II*, 355 Fed.Appx. 478, 481 (2d Cir. 2009).  As was the case in *Lomotey I* and *II*, Lomotey has once again failed to provide sufficient evidence to establish a *prima facie* claim of a policy, pattern, or practice of intentional discrimination.

### Analysis of Title VII claim

Title VII makes it unlawful for an employer to "fail or refuse to hire ... or otherwise to discriminate against any individual ... because of such individual's race, color, [or] ... national origin." 42 U.S.C. 2000e-2(a)(1).  Plaintiff's failure to promote claim is analyzed under the three-step burden shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  "A plaintiff asserting a Title VII discrimination claim based on a failure to promote establishes a *prima facie* case by showing that at the relevant time: (i) the plaintiff was a member of a protected class; (ii) the plaintiff applied for and was qualified for the job; (iii) the plaintiff was rejected for the position; and (iv) the rejection of the plaintiff's application occurred under circumstances giving rise to an inference of discrimination." *Lomotey II*, 355 Fed. Appx. at 480.  "A plaintiff's burden in establishing a *prima facie* case of employment discrimination is not an

onerous one; he merely has to present facts sufficient to give rise to a presumption of discrimination." *Lomotey I*, 2009 WL 82501 at *3.

"A *prima facie* case gives rise to a presumption of unlawful discrimination, and the burden of production then shifts to the defendant to proffer a legitimate, nondiscriminatory reason for the challenged employment action.  If a proper reason is advanced, the presumption of discrimination drops out and "the final burden rests on the plaintiff to prove ... that the proffered nondiscriminatory reason was pretextual ..." *Lomotey II*, 355 Fed. Appx. at 480.   In other words, the Plaintiff "must prove that the legitimate reasons offered by the defendant were "'not its true reasons but were a pretext for discrimination.'" *Lomotey I*, 2009 WL 82501 at *3 (quoting *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001)). "Where Plaintiff raises legitimate questions about whether the proffered reasons are credible or convincing, that goes toward establishing that the reason is pretextual." *Id.*

Here it is undisputed that Plaintiff is a member of a protected class, that he applied for and was qualified for both positions and that he was rejected for both positions.  Lomotey possessed the minimal qualifications to apply for both the 2006 TPE position and the 2007 TSE position.  Lomotey suffered a materially adverse employment action when he did not receive any of the promotions for which he applied.  Defendant argues that Lomotey has failed to present evidence which gives rise to an inference of discrimination.  However as the *Lomotey I* court noted, Plaintiff has presented evidence that "all but one of the people selected for the many positions for which Plaintiff applied and was qualified were

white." *Lomotey I*, 2009 WL 82501, at *4. It is undisputed that a white male was also selected for both the 2006 TPE and the 2007 TSE positions. Considering that Plaintiff has a *de minimus* burden in establishing his *prima facie* case, the Court finds that such evidence gives rise to an inference of discrimination.

Since Lomotey has met his *de minimus* burden to establish a *prima facie* case, the burden shifts to Defendant to proffer a legitimate nondiscriminatory reason for the challenged employment action. As was the case in *Lomotey I*, Defendant has stated that Lomotey was not chosen for either the 2006 or 2007 position because he was not the most qualified candidate for either position based on his poor performance during the interviews and his lack of significant supervisory and lead responsible experience as compared to the successful candidates. Since Defendant has articulated a legitimate non-discriminatory reason, the burden shifts back to Lomotey to offer evidence that Defendant's reasons are merely pretext for unlawful discrimination.

As he did in *Lomotey I*, Lomotey principally relies on a credentials-based theory to establish the pretextual nature of Defendant's reason for not promoting him. Lomotey argues that he was more qualified than both Cancelliere and Sweeney who were the successful candidates for the 2006 and 2007 positions respectively. The Second Circuit has emphasized that even if a plaintiff was more qualified than the successful candidate "'Title VII does not require that the candidate whom a court considers most qualified for a particular reason be awarded that position; it requires only that the decision…not be discriminatory.'" *Wharff v. State University of New York*, 413 Fed.Appx. 406, 408 (2d Cir. 2011)

(quoting *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980)).  "Where a decision to … promote… one person rather than another is reasonably attributable to an honest even through partially subjective evaluation of their qualifications, no inference of discrimination can be drawn" *Id.* (internal quotation marks and citation omitted).  Furthermore, courts "must respect the employer's unfettered discretion to choose among qualified candidates." *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 103 (2d Cir. 2001) (internal quotation marks and citation omitted).

As was the case in *Lomotey I*, Lomotey fails to offer any direct evidence of bias such as racially loaded comments or other incidents.  Although "plaintiffs are not required to offer direct evidence of bias, which can be difficult to find; it is theoretically possible to establish a discriminatory motive based on sufficiently persuasive evidence of pretext alone" but when "'a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination.  In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" *Parikh v. New York City Transit Authority*, 681 F. Supp. 2d 371, 379 (E.D.N.Y. 2010) (quoting *Brynie*, 243 F.3d at 103).

28

As the *Lomotey I* court concluded "Plaintiff's own characterization of himself notwithstanding, Plaintiff appears from the record to have been an average or above-average employee, but not the outstanding employee whose qualifications were so clearly superior to those of the selected candidates that no reasonable person could have chosen the selected candidate over the Plaintiff for the job in question."  *Lomotey I*, 2009 WL 82501 at *8.  Further, the *Lomotey I* court appropriately reminded the parties that "Defendants are entitled to pick between comparably qualified employees, may rely on any non-discriminatory basis in doing so, and may consider somewhat subjective factors such as interview performance as well as the candidates' qualifications on paper in making their hiring and promotions decisions." *Id.*

### i.    *2006 TPE Position*

In connection with the 2006 TPE position, Lomotey has failed to present evidence that no reasonable person, in the exercise of impartial judgment, could have chosen Cancelliere over him.   First, Cancelliere had more years of experience than Lomotey.  Cancelliere had worked for 13 years at the TSE level which is the level above Lomotey who is currently at the TE3 level.  As was the case in *Lomotey I*, Plaintiff has once again applied for a position which is two levels above his current position and not in conformity with the typical DOT career progression.  In fact, Cancelliere's promotion from the TSE to the TPE level was in conformity with the DOT's typical career progression.  Although Cancelliere and Lomotey had similar performance appraisals, Cancelliere was

performing at the TSE level and therefore his duties and responsibilities were different than Lomotey who was performing at the TE3 level.

It is therefore not surprising that Defendant concluded that Cancelliere had better and longer experience working in a supervisory capacity than Lomotey. Since the TPE position in the Bridge Design Unit was principally a supervisory position, the DOT considered significant past supervisory and lead responsibility experience as important to the position.  It is undisputed that Cancelliere had experience managing large teams of consultant liaisons and staff engineers and had managed 250 projects with different staff and budgets; whereas Lomotey had much less significant supervisory experience.

Lomotey attempts to create a dispute of material fact by arguing that he never spoke about his private industry supervisory experience at the interview even though Defendant has resubmitted that his private industry experience was insufficient in the present action.  Instead Lomotey argues that he spoke about his experience as a supervisor in the Load Evaluation Group where he was in charge of 6 employees.  However even when viewing the facts in the light most favorable to Plaintiff, a reasonable jury could not conclude that Lomotey's experience managing six employees in the Load Evaluation Group was far superior to Cancelliere's 13 years of experience managing hundreds of projects and employees.  In addition, a "party opposing summary judgment cannot defeat the motion by relying on … mere assertions that affidavits supporting the motion are not credible."  *Welch-Rubin*, 2004 WL 2472280, at *1 (internal quotation marks and citations omitted).

Lomotey argues that Cancelliere did not have familiarity with bridge design and that the DOT was required to promote only candidates that have work experience in the specific technical field. Lomotey argues that Cancelliere was principally a highway engineer and not a bridge engineer like himself. However, Defendants have submitted evidence that Cancelliere did have experience working in the bridge design field as he had overseen the DOT's Bridge programs for over 17 years and that he demonstrated knowledge and skills relevant to bridge design which were important to the position. Defendant, in exercising its business judgment, determined that Cancelliere's experience and demonstrated knowledge of bride design issues was sufficient to meet the responsibilities and duties of the TPE position. Lomotey simply cannot demonstrate pretext through his unsubstantiated belief and his own opinion that Cancelliere did not have the appropriate amount of bridge design experience for the TPE position. A reasonable jury could not conclude based on the evidence in the record that Cancelliere had no or insufficient experience with bridge design as Lomotey suggests.

Lomotey also argues that he is more qualified because he has a masters degree whereas Cancelliere does not and that he is the only DOT engineer that holds a PE license in structural engineering. However as Defendants explained Connecticut does not offer specialized PE licenses so the fact that Cancelliere does not have a PE license in structural engineering does not demonstrate that Lomotey is somehow more qualified. Further, the fact that Lomotey has a

masters degree does not necessarily make him more qualified.  If that was the case than an employer would be forced to always hire the candidate who holds the most degrees irrespective of the candidate's work experience.  Such a result would be illogical and contrary to an "employer's unfettered discretion to choose among qualified candidates." *Byrnie*, 243 F.3d at 93 (internal quotation marks and citation omitted).

In addition, Cancelliere significantly outperformed Lomotey during the interview for the TPE position.  Lomotey attempts to create a dispute of material fact by putting forth his own opinion that he does interview well and his belief that the DOT's "vague assessment" that he does not interview well is not well-founded or believable.  First, the Defendant has provided a very detailed and specific explanation of why Lomotey failed to perform well in the interview at issue.  Defendant has explained why Lomotey's answers to their specific questions were insufficient.  For example, Defendant indicated that Lomotey was asked about the CSS approach during the interview and that he demonstrated no understanding of the approach despite having previously received training on it.  Contrary to Lomotey's belief, Defendant has not given a vague, conclusory, or generalized statement of its reasons for determining that Plaintiff did not interview well.

Second, Lomotey attempts to prove the strength of his interviewing skills on the basis of his belief that he has performed well orally while representing the DOT in litigation, during bridge inspections, and during his original interview with the DOT in 1994.  However, Lomotey's belief that he performed well in settings

outside the specific interview at issue is entirely irrelevant and somewhat of a red herring in itself.   Moreover, it is common sense knowledge that if a person performs well once in the past that does not mean that the same person will perform well again in the future.   It is well established that a plaintiff cannot avoid summary judgment "on the basis of conjecture or surmise" *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 19 (2d Cir. 1995).   Here, Lomotey's beliefs and unsubstantiated opinions as to his interview skills are simply conjecture or surmise and fall far short of the admissible evidence that is necessary to defeat summary judgment.

Lastly, Lomotey attempts to attack the credibility of Defendant's evidence regarding his interview performance by stating that he has no recollection that the interview panelists were taking contemporaneous notes during his interview. However, Lomotey may not defeat summary judgment on the basis of his assertion that he did not recall whether DOT interviewers were taking notes.  It does not follow that because Lomotey does not remember Defendant's evidence is not credible. See *Welch-Rubin*, 2004 WL 2472280, at *1.  Moreover, even assuming that none of the panelists took notes during the interview, the panelists could have just as easily written down their impressions immediately after the interview concluded.  The fact that there may have been no contemporaneous note taking does not in of itself suggest that the Defendant's interview records are not credible or accurate.  Further, assuming that the interview panelists did not take contemporaneous notes, that fact, alone, does not support an inference that the Defendant's stated reasons for choosing Cancelliere over Lomotey were

pretextual.  *See Pippin v. Town of Vernon*, 660 F.Supp.2d 354, 366-67 (D. Conn. 2009) ("evidence that the interview panelists were not careful in confirming the accuracy of each applicant's resume cannot support an inference that the panelists … explanations for choosing [the successful candidate] lack credibility … Plaintiff's proffer, even if it suggests that the Town's hiring practices were sloppy or not thorough, does not support any inference that the interview panelists' stated rationales for recommending [the successful candidate] were pretextual.").

In addition, Defendant has provided a very detailed and specific explanation of why Cancelliere performed well in the interview at issue indicating that he provided the most thorough answers to the most questions out of any candidate.  For example, Cancelliere provided the most thorough description and understanding of the CSS approach and had described the public involvement process.  Considering that Defendant has presented very detailed and specific evidence that Cancelliere performed well and that Lomotey performed less well during the interview process, a reasonable jury could not conclude that Lomotey was overwhelmingly the best candidate for the TPE position.

A recent decision in the Eastern District of New York is particularly relevant and instructive to the present action.   In *Parikh v. New York City Transit Authority*, 681 F. Supp. 2d 371 (E.D.N.Y. 2010), the plaintiff, a civil engineer with the New York City Transit Authority, brought a Title VII and ADEA action based on a failure to promote.   The City submitted that the plaintiff was not promoted because he was not the most qualified candidate.  681 F.Supp.2d at 377-78.  The

plaintiff argued that he was more qualified because he held a PE license which the successful candidate did not and instead the successful candidate was only a Certified Industrial Hygienist. However the *Parikh* Court concluded that the fact that the successful candidate lacked a PE license did not demonstrate that the City's reasons were a pretext for racial animus.  The *Parikh* Court reasoned that although the successful candidate did not have a PE license, his certification "demonstrates skills useful to the position" and noted that the position did not require a PE license.   The *Parikh* Court further noted that the successful candidate "outscored plaintiff in two separate evaluations of their interviews and resumes."  *Id.*  In sum, the *Parikh* court found that "the parties differ as to their assessments of the proper requirements for the construction unit head position as well as [plaintiff's] performance as an acting CM, but, absent improper motive, defendant is entitled to make its own determinations on these points.  Plaintiff is doubtless passionately convinced of his superiority to [the successful candidate] and his entitlement to the position as CM, but this subjective belief is not an adequate basis for a claim of discrimination under Title VII."  *Id.* at 380.

Here as was the case in *Parikh*, the parties differ as to the assessment of the proper requirements for the TPE position as well as their assessment of the strength and nature of Lomotey's and Cancelliere's prior work experiences. Indeed, Lomotey is likewise doubtless passionately convinced of his superiority to Cancelliere, but as the *Lomotey I* court already concluded this subjective belief is not an adequate basis for a claim of discrimination under Title VII.  In sum even viewing the facts in the light most favorable to the Plaintiff, a reasonable jury

could not conclude that Lomotey's credentials were so superior that no reasonable person, in the exercise of impartial judgment, could have chosen Cancelliere over Lomotey for the 2006 TPE job.

### ii.    2007 TSE Position

In connection with the 2007 TSE position, Lomotey has once again failed to present evidence that no reasonable person, in the exercise of impartial judgment, could have chosen Sweeney over him.   Both Sweeney and Lomotey were TE3 engineers and therefore their application to the TSE position was in line with the typical DOT career progression.   It is undisputed that Sweeney had significantly better performance appraisals than Lomotey having received "excellent" ratings in every category on each of his last two appraisals. Sweeney, like Lomotey, possessed a masters degree in structural engineering and a current Connecticut PE license.

Lomotey attempts to argue that the DOT favored Sweeney because he was never required to take an exam for the position.   However, Defendant has explained that no candidate, including Lomotey, was required to take an exam to apply for the position as DAS had suspended all exams pending negotiations with the Connecticut State Employee Association over revising the engineering job specifications. After the negotiations ended, the exam requirement was eliminated for all TSE positions.   Defendant therefore did not make a special exception for Sweeney as Lomotey insinuates.   If Lomotey had been the successful candidate, he would have also not been required to take an exam.

As was the case for the 2006 TPE position, Defendant has explained in detail how Sweeney outperformed Lomotey during the interview for the 2007 TSE position.  Sweeney provided the most comprehensive answers to all of the questions asked than did the other candidates including Lomotey.  In addition, Lomotey at one point during the interview described an incorrect process which Sweeney had described correctly.  As discussed above, contrary to Lomotey's contention Defendant has not given a vague, conclusory, or generalized statement of its reasons for determining that Lomotey did not interview well or its reasons for concluding that Sweeney performed better during the interview.   In addition as discussed above, Lomotey's allegation that no interview panelist during his interview for the 2007 TSE position took contemporaneous notes is not sufficient to demonstrate that Defendant's proffered reasons why it choose Sweeney over Lomotey were pretextual.

Further, Defendant concluded that Sweeney had better supervisory and lead responsibility experience than Lomotey which was important for the TSE position.  Although Lomotey has some experience managing consultants during his 13 years of employment at the DOT, Defendant asserts that he lacked lead responsibility for large projects and only had lead assignment for two smaller projects.  In contrast, Sweeney had over 10 years of experience at the DOT and for approximately eight of those years he had lead responsibility over hundreds of projects albeit those projects were smaller scaled ones.  Therefore Sweeney had lead responsibility in connection with hundreds of smaller bridge projects whereas Lomotey only had lead responsibility for two smaller bridge projects and

had overseen six employees in the Load Evaluation Group.  A reasonable jury could not conclude that Lomotey's experience managing two smaller projects, overseeing consultants and supervising six employees in the Load Evaluation Group was far superior to Sweeney's substantial experience having lead responsibility for hundreds of smaller bridge projects over his ten years of employment at the DOT.

Again as was the case in *Parikh*, the parties have differed as to the assessment of the proper requirements for the TSE position as well as their assessment of the strength and nature of Lomotey's and Sweeney's prior work experiences.  Once again, Lomotey is doubtless passionately convinced of his superiority to Sweeney, but his subjective belief as to his superiority is not an adequate basis for a claim of discrimination under Title VII.  A reasonable jury could not conclude that Lomotey's credentials were so superior that no reasonable person, in the exercise of impartial judgment, could have chosen Sweeney over Lomotey for the TSE position.

Lastly, Lomotey argues that the 2007 TSE position should not have been posted as a temporary position and personally opines that there was no immediate business need to warrant the creation of a temporary position. However, the Court's "role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments."  *Brynie*, 243 F.3d at  103 (quoting *Simms v. Oklahoma ex. Rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999)). The Court will therefore not second guess the DOT's business decision to post

the 2007 TSE position as a temporary position.  Lomotey conclusory alleges that the DOT's assessment that there was an immediate business need for a temporary position was a cover for a "retaliatory refusal to promote" him.  However, the Court is unclear how the fact that the position was posted as a temporary one demonstrates that Defendant's reasons for not choosing Lomotey for the position were pretextual.  This is not the case where the DOT created the position especially for Sweeney and did not allow any other candidates like Lomotey to apply for the position.  Accordingly, Lomotey has failed to submit admissible evidence from which a reasonable jury could conclude that Defendant's reasons for not selecting Lomotey for the 2007 TSE position were a pretext for racial animus.

### iii.   Analysis of Plaintiff's remaining arguments

In addition to advancing a credentials-based theory, Lomotey attempts to demonstrate pretext in several other ways.   The Court will now address Lomotey's other arguments regarding pretext.

Lomotey argues that the typical career progress of TE3 to TSE to TPE has been disregarded when it comes to Caucasian males and he points to his unsupported assertions that Lewis Cannon was promoted in less than two years from TE3 to TCA and that Sweeney did not spend six months at the TSE position before being promoted again.  He also asserts that all of the Caucasion engineers of the TE3 and TE2 rank, who worked with him in 1994 have been steadily promoted and again points to his unsupported assertion that Goerges, Reilly and

Hannifan have all been regularly promoted beyond their initial starting levels whereas he has not.  Lomotey appears to be suggesting that it is abnormal for an engineer to be promoted after working just one-two years or less at his or her current level.  However, Lomotey has not introduced evidence establishing what is the average number of years a DOT engineer typically works at a current level before receiving a promotion to the next level and therefore the Court cannot truly assess whether there exists a significant trend demonstrating that the typical career progression has been disregarded or not.   As the Second Circuit noted in *Lomotey II*, Lomotey's evidence again just "amounts to nothing more than raw numbers, which, without further information on key considerations such as the racial composition of the qualified labor pool, cannot support an inference of discrimination."  *Lomotey II*, 355 Fed. Appx. at 481.  Moreover, Lomotey has only presented a small subset of raw numbers and has not provided the Court with a comprehensive survey and statistical analysis regarding the career progression of all DOT engineers.

In addition, Lomotey has failed to introduce evidence beyond his own unsubstantiated opinions and beliefs that these individuals were not the most qualified candidates for the positions they obtained or evidence that their promotions were somehow reflective of the DOT's allegedly unlawful racial animus.  It is well established that "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).   Here Lomotey's evidence regarding the progression of white

engineers consists solely of his own statements which are devoid of specifics and replete with conclusions and therefore cannot serve as a basis to defeat summary judgment.

Further there is other evidence in the record which undermines Lomotey's assertion that the typical career progression of TE3 to TSE to TPE has been disregarded when it comes to white engineers.  For example, there is evidence that several white engineers, like Lomotey, worked for many years in their current positions before receiving a promotion to the next level.  For example, Cancelliere had worked for 13 years at the TSE level before receiving a promotion to the TPE level.  In addition, Sweeney had worked for eight years at the TE3 level before being promoted to the TSE level.  Lastly, Lomotey's own professional path also undermines this allegation as he was promoted from Engineer Intern to TE3 within nine months bypassing the TE1 and TE2 levels altogether.  Accordingly, Lomotey's unsupported and speculative allegations that the typical career progression has been disregarded and that other white engineers have been promoted whereas he has not cannot support an inference of discrimination and a reasonably jury could not conclude that Defendant's nondiscriminatory reasons for not promoting Lomotey were a pretext for discrimination on the basis of such conjectural assertions.

Lomotey also raises the argument that he was inappropriately hired as an Engineer Intern in 1994 and should have been hired at the TE3 level on the basis of his prior work experience.  Lomotey had advanced this same exact argument in *Lomotey I* which the court found unpersuasive.  The *Lomotey I* court explained

that "[f]irst of all, this occurred in 1994, and is therefore outside the period directly at issue in this lawsuit.  Even if considered as background context, however, Plaintiff's promotional path in this respect fails to support his allegation of racial discrimination.  Defendant Zaffetti, who is white, was also hired as an engineer intern, despite already having significant experience before being hired, and Zaffetti was also promoted to TE3 a year later, after taking and passing the applicable exam that was then required. So too did Plaintiff's passage of the relevant exam several months after being hired enable his promotion from engineer intern to TE3." *Lomotey I*, 2009 WL 82501, at *5.

Lomotey alleges that other minority DOT employees experienced a "levelizing" of their careers.  However, without statistical evidence or other substantial evidence demonstrating a pattern-or-practice of discrimination the fact that the DOT may or may not have discriminatorily denied promotions to two other minority employees at different times for different positions cannot support an inference that the DOT denied Lomotey promotion in connection with the 2006 and 2007 positions as a result of racial animus.  In the absence of evidence establishing that intentional discrimination was the Defendant's standard operating procedure, there is simply no discernible nexus between these separate alleged incidents of discrimination on behalf of other employees and the DOT's failure to promote Lomotey.

In support of this allegation, Lomotey points to Wanda Seldon who worked in the human relations field at the DOT and argues that she was discriminatorily denied a promotion.  However, Lomotey has failed to introduce evidence beyond

his own unsubstantiated and speculative opinion that the denial of her promotion was the result of racial animus.   First, Lomotey has failed to introduce any evidence that Seldon was overwhelmingly more qualified than Aprin who has the successful candidate for the position.   In fact, Ms. Seldon testified in her deposition that although she believed she was qualified for the position that she could not speak to whether Aprin was more qualified than her.   Second, Ms. Seldon was not an engineer like Lomotey and therefore her experience in the human resources department does not offer a meaningful comparison to Lomotey's experience as an engineer.   A reasonable jury could not conclude on the basis of Lomotey's personal belief that Ms. Sheldon was discriminatorily denied a promotion by the DOT that Defendant's reasons for not promoting Lomotey in connection with either the 2006 or 2007 position were a pretext for discrimination.

Lomotey also points to his supervisor Ralph Phillips, a TSE engineer, who he claims was also discriminatorily denied repeated promotions by the DOT. Lomotey has again failed to introduce admissible evidence beyond his own speculative belief that Phillips was denied promotions as result of racial animus. Lomotey has failed to introduce evidence that Phillips was overwhelmingly more qualified than any of the successful candidates for the positions he sought.   In fact, Lomotey has failed to provide any details regarding how many positions Phillips had applied to nor has he provided any information regarding the credentials of the individuals who were the successful candidates.

Lomotey offers into evidence a 10/13/2011 transcript from his fact-finding conference before the CHRO in which Ralph Phillips served as Lomotey's witness and also spoke about his own experience as a DOT employee in which he states that he was passed over for promotions even though he interviewed well, had eventually obtained a PE license and had many years of good substantive experience.  First, the CHRO transcript is inadmissible hearsay and therefore cannot be used to defeat summary judgment. *See* Fed. R. Evid. 802.  Second, even if the transcript wasn't inadmissible hearsay, Phillips's statements in the transcript as to his personal belief that he was passed over for promotions even though he was well qualified could not support an inference of discrimination in connection with a claim based on his own failure promote nevertheless Lomotey's claim.  Further, the Second Circuit has held that where an affidavit in support or opposition to summary judgment is "wholly conclusory, amount[ing] only to a naked speculation concerning the motivation for a defendant's adverse employment decision" it would be prohibited by Federal Rule of Evidence 701(b). *Timbie v. Eli Lilly & Co.*, 429 Fed. Appx. 20, [] (2d Cir. 2011).  Even if Phillips had provided a sworn affidavit in the matter, his statements regarding his and Lomotey's experiences at the DOT are conclusory and amount to naked speculation as to the DOT's motivation in connection with his own and Lomotey's promotion denials.  Accordingly, a reasonable jury could not conclude based on Lomotey's evidence regarding the "levelization" of other minorities' careers at the DOT that the Defendant's reasons for not promoting him to the TPE or TSE positions were a pretext for unlawful discrimination.

As noted above Lomotey had made an allegation in his complaint that DOT's Equal Employment Manager Cordula had alleged in her own federal lawsuit that the DOT protects and rewards white males by placing them in temporary positions.   Lomotey has failed to submit Cordula's testimony in opposition to summary judgment.   Defendant has indicated her testimony was submitted in *Lomotey I* and that Defendants presented evidence that Cordula's allegations were limited to the higher level positions of Transportation Assistant District Engineer and Transportation District Engineer for which Cordula testified that plaintiff was not qualified for nor had he applied for such positions.   Further, Defendant has submitted a new affidavit from Cordula indicating that she reviewed the interview selection reports for both the 2006 TPE and 2007 TSE positions that are the subject of the present action and that she had approved both reports which indicated that she agreed with the recommendations to hire Cancelliere and Sweeny for the positions and that she had no concerns with the overall process.   Although Defendants need only proffer, not prove, the existence of a nondiscriminatory reason for their employment decision, Cordula's affidavit serves to corroborate Defendant's proffered reasons for not promoting Lomotey. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) ("This burden is one of production, not persuasion; it can involve no credibility assessment.")   (internal quotations omitted).

Lastly, Lomotey argues that the DOT would waive its exam requirements for white candidates by posting positions as temporary ones.   However as discussed above, Defendant has explained that the exam requirements were

suspended once as a result of DAS's negotiations over revising the engineering job specifications. Moreover, since Lomotey had also applied for the temporary position he also benefitted from the suspension of the exam requirements along with any other candidate for the temporary position. The issue of exams was also raised in *Lomotey I*. In 1995, the DOT eliminated merit exams and Lomotey argued that the elimination of the merit exam had the effect of disadvantaging him as it increased the Defendant's reliance on job interviews. *Lomotey I*, 2009 WL 82501at *5. The *Lomotey I* court concluded that Lomotey had "offered no evidence to support his far-fetched and conclusory allegation that preventing his promotion was Defendants' motivation for the elimination of the exams." The *Lomotey I* court noted that in 2004 the DOT "reinstituted the exams, but solely to determine a candidates minimum eligibility for the position through attainment of a passing grade, and Defendants do not rank or appoint candidates for positions based solely upon their relative test scores." *Id.* at *6. As was the case in *Lomotey I*, Lomotey has failed to off any evidence that Defendant's motivation in posting these positions as temporary ones was to eliminate the exam requirement for the benefit of white candidates over minority candidates. There is simply no evidence to support Lomotey's far fetched and conclusory allegation that the posting of temporary positions and the corresponding waiver of the exam requirement was a cover for a retaliatory refusal to promote Lomotey.

In sum, Lomotey has once again failed to present evidence that would permit a reasonable trier of fact to conclude that Defendant's proffered reasons for not promoting Lomotey to the 2006 TEP or the 2007 TSE positions were a

pretext for unlawful discrimination.  Therefore Defendant's motion for summary judgment as to Lomotey's failure to promote claims are granted.

<u>Analysis of Retaliation claim</u>

Title VII prohibits an employer from "discriminat[ing] against any of [its] employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. §2000e-3(a).  "To establish a *prima facie* case of retaliation under Title VII, plaintiffs must show that: (1) they engaged in a protected activity; (2) their employer was aware of this activity; (3) the employer took adverse employment action against them; and (4) a causal connection exists between the alleged adverse action and the protected activity."  *Lomotey II*, 355 Fed. Appx. at 481-82.  The Supreme Court has broadened the spectrum of conduct that can qualify as an adverse employment action for retaliation cases finding that an adverse employment action is any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61-62, 66 (2006).  Retaliation claims are also analyzed using the burden-shifting framework set forth in *McDonnell Douglas*.   "If a plaintiff meets [their prima facie] burden and the defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must offer evidence sufficient to permit a rational factfinder

to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Lomotey II*, 355 Fed. Appx. at 482.

Defendant, in its memorandum in support of its motion for summary judgments suggests that Lomotey's retaliation claim is based on the two failures to promote and a 30 day suspension that Lomotey received for a violation of Personnel Memorandum No. 81-4. *See* [Dkt. #98, Def. Mem. at 45]. Lomotey has responded that his retaliation claim is solely based on the two failures to promote and not the 30 day suspension. Lomotey indicates that he has a pending dually filed charge before the CHRO based on "the disciplinary suspension as well as failures to promote and lateral transfer claims." *See* [Dkt. #108, Pl. Mem. at 24]. In addition as Lomotey points out, he has not made any allegations regarding his suspension in the operative complaint. Accordingly, the Court will only assess the parties' arguments with respect to the two failures to promote that are at issue.

Here, it is undisputed that Lomotey engaged in protected activities when he filed his numerous CHRO complaints and his prior lawsuit in the District of Connecticut and that the DOT was aware of these activities. As the *Lomotey I* court concluded, the failure to promote constitutes an adverse employment action for purposes of a retaliation claim. *Lomotey I*, 2009 WL 82501, at *8-9. However, it is questionable if Lomotey can demonstrate that a causal connection exists between the alleged failures to promote and Lomotey's protected activities. "Causation can be demonstrated indirectly by showing that the protected activity was followed closely [in time] by discriminatory treatment, through other

evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant." *Lomotey I,* 2009 WL 82501, at *10 (internal quotation marks and citations omitted).   Here, Lomotey has failed to offer any direct evidence of retaliatory animus such as negative comments from his supervisors regarding his CHRO complaints or prior lawsuit nor has he introduced evidence of any disparate treatment of fellow employees who have engaged in similar conduct.

Defendant therefore argues that Lomotey must rely on temporal proximity alone to demonstrate causation.  When temporal proximity alone is used to show causation, the proximity must be "very close" in order to support a *prima facie* case of retaliation*. Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (20 month period suggested, "by itself, no causality at all"); *see also Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 503 (S.D.N.Y. 2010) ("most of the decisions in this Circuit that have addressed this issue have held that lapses of time shorter than even three months are insufficient to support an inference of causation"); *Ghaly v. U.S. Dept. of Agric.*, 739 F. Supp. 2d 185, 200 (E.D.N.Y. 2010) (nine month period between protected conduct and retaliation did not support causation); *Ragin v. E. Ramapo Cent. School Dist.*, No. 05 Civ. 6496, 2010 WL 1326779 at *24 (S.D.N.Y. Mar. 31, 2010) (five month period did not support causation); *but see Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 230 (E.D.N.Y. 2010) (failure to promote retaliation claim occurring just over three months after

protected conduct did demonstrate causation where that was the first opportunity for accused to take retaliatory action).

Both parties have failed to provide the Court with the dates of the most recent CHRO filings that Lomotey has made.  However the *Lomotey I* court noted that Lomotey had filed CHRO complaints on September 26 and 27, 2000, June 11, 2001, September 4, 2002, May 3, 2004, and March 17, 2005. *Lomotey I*, 2009 WL 82501, at *11.  Considering this pattern of protected activities, the *Lomotey I* court concluded that "Defendants had clearly been on notice for several years of Plaintiff's complaints of discrimination, making the filing of the later CHRO complaints rather questionable as triggers for subsequent retaliation.  It is also worth noting that Plaintiff had applied unsuccessfully for numerous promotions prior to engaging in the first protected activity in 2000. Plaintiff's subsequent failures to be selected for other promotions which he sought therefore suggests a continuation of the previous pattern rather than a change in Defendants' treatment of Plaintiff following soon after Plaintiff's first complaints, which might have been suggestive of retaliation." *Id.* at 12.  In the present case it has been about seven years since Lomotey made his first complaint of discrimination in 2000 and the denial of the 2006 TPE position.  Further, Lomotey has regularly made subsequent complaints of discrimination approximately every year since 2000.  Since Lomotey's modus operandi is to repeatedly file a CHRO complaint after he has been denied a promotion it is dubious that Lomotey's most recent CHRO complaints were the triggers for the allegedly subsequent retaliations in connection with the 2006 TPE and 2007 TSE positions.  As the *Lomotey I* court

noted this pattern suggests the continuation of a previous pattern and not a change in Defendant's treatment of Lomotey following his initial complaints of discrimination in 2000.

Moreover, Lomotey concedes in his memorandum in opposition to summary judgment that timing alone cannot establish causation in the present case. *See* [Dkt. #108, Pl. Mem. at 9]. Instead, Lomotey argues that causation can be established by Defendant's "vague and generalized declarations regarding their essential claim about why Plaintiff has not been promoted." [*Id.*]. Lomotey rehashes the same arguments that he advanced in support of his argument that Defendant's reasons for failing to promote him were a pretext for discrimination as support for his argument that a causal connection exists. [*Id.*].

Here even assuming that Lomotey had established that a causal connection exists between his protected activities and the failures to promote at issue, he has failed for the same reasons as discussed above to demonstrate that DOT's stated reasons for not promoting him were a pretext for retaliation. As the *Lomotey II* court concluded, Lomotey has once again "not pointed to any direct evidence that his participation in protected activities factored into the DOT's decision not to promote him." *Lomotey II*, 355 Fed. Appx. at 482. There is simply no evidence of animus by anyone at the DOT related to Lomotey's many protected activities. Moreover, as the *Lomotey II* court emphasized Lomotey cannot rely on conclusory attacks on the DOT's credibility to constitute circumstantial evidence of pretext. *Id.* Accordingly, a reasonable jury could not conclude that Defendant's reasons for not promoting Lomotey were a pretext for

retaliation.  Defendant's motion for summary judgment as to Lomotey's claims of retaliation are therefore granted.

**Conclusion**

Based upon the above reasoning, the Defendant's [Doc. #96] motion for summary judgment is GRANTED as to all of Plaintiff's claims.  The Clerk is direct to close the file.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: February 28, 2012